UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

APRIL L. HOPP,

    Plaintiff,

v.                                                                                  Case No. 1:21cv214-AW-HTC

KILOLO KIJAKAZI,
Commissioner of Social Security,

    Defendant.
_____/

REPORT AND RECOMMENDATION

In this action under 42 U.S.C. § 405(g), Plaintiff April L. Hopp seeks judicial review of the final determination of the Commissioner of Social Security ("Commissioner") denying disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34. ECF Doc. 1. Upon consideration of the administrative record and the memoranda of the parties, ECF Docs. 11 & 13, the undersigned recommends the decision of the Commissioner be AFFIRMED.

**I.    BACKGROUND**

Plaintiff filed an application for DIB on November 20, 2019, alleging an onset date of December 6, 2016, based on the following impairments: migraines, back pain, digestive issues, leg pain, nerve damage, epileptic seizures, high blood

pressure, memory problems, bladder issues, digestive issues, anxiety, depression, and vision issues. Tr. 74-75.

Plaintiff was 46 years old at the time of her onset date. Tr. 37. She has a twelfth-grade education and previously worked as a school bus driver. Tr. 39. Plaintiff resides with her husband in Louisville, Kentucky, but travels to Florida on a regular basis, where she spends half her time with her husband and daughter. Tr. 37-38. Plaintiff's primary complaints appear to be related to her migraines and irritable bowel syndrome ("IBS"). She reported having "episodes" where "everything goes black" and headaches that last for up to four (4) days. Tr. 49. She also reported having episodes of severe diarrhea. Tr. 52. Additionally, Plaintiff complained about lower extremity pain, behind her knee down to her ankle, and sometimes in both legs, resulting in the need for her to ambulate with a cane. Tr. 56-58.

Plaintiff's DIB claim was denied initially on March 31, 2020, Tr. 92, and upon reconsideration on June 18, 2020, Tr. 116. After a hearing before the Administrative Law Judge ("ALJ"), the ALJ entered an unfavorable decision denying benefits on April 7, 2021. Tr. 15. The Appeals Council affirmed on October 29, 2021, making the ALJ's decision the final decision of the Commissioner. Tr. 1. Plaintiff filed a complaint seeking review of the Commissioner's decision on December 24, 2021. ECF Doc. 1. Plaintiff raises one ground on appeal – that the Commissioner's

residual function capacity ("RFC") determination is not supported by substantial evidence. Specifically, Plaintiff contends the ALJ failed to consider that the combination of her impairments renders her incapable of working a full 8-hour day because she would be off-task 10-15% of the workday. As will be discussed below, the record is devoid of any evidence supporting Plaintiff's position.

## II.   THE ALJ'S FINDINGS

The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)(4), the Commissioner analyzes a disability claim in five (5) steps. At step 1, the Commissioner determines if the claimant is performing substantial gainful activity. If she is, she is not disabled. At step 2, the Commissioner determines whether the claimant's impairments are severe. If any impairment is severe, the Commissioner proceeds to step 3 to determine whether any severe impairments have lasted or are expected to last for a continuous

period of at least 12 months, and if the impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. If they do, the claimant is disabled. If not, the Commissioner proceeds to step 4 to determine if the claimant's impairments prevent her from performing her past relevant work. At this step, the Commissioner determines the claimant's RFC, which is the most the claimant can do despite her impairments. If the claimant cannot perform past relevant work, the Commissioner proceeds to step 5 and determines whether other jobs exist in significant numbers in the national economy that accommodate the claimant's RFC and vocational factors. If such jobs exist, she is not disabled.

 Here, at step 1, the ALJ determined Plaintiff had not engaged in substantial gainful activity since December 6, 2016, the alleged onset date. Tr. 17. At step 2, the ALJ determined Plaintiff suffered from the following severe impairments: migraines, cervical and lumbar degenerative disc disease, depression, and anxiety. *Id.* At step 3, the ALJ determined Plaintiff does not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed impairments. *Id.* at 18. The ALJ, however, determined Plaintiff is moderately limited in the ability to interact with others, to concentrate, persist, and maintain pace, and to adapt or manage herself. *Id.* at 19. At step 4, the ALJ determined Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b), with

the following restrictions or limitations: "occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to extreme temperatures involving cold, heat, humidity and wetness. There should be no concentrated exposure to vibrations. She should avoid all exposure to flashing lights and hazards such as unprotected heights and the operation of dangerous moving machinery. She can understand, remember, and carry out simple routine tasks. She can tolerate occasional interaction with supervisors, co-workers, and the public. She should not perform work with strict production requirements." Tr. 20. Finally, at step 5, the ALJ determined, based on the testimony of a vocational expert ("VE"), that Plaintiff could not perform any past relevant work and that jobs exist in significant numbers in the national economy Plaintiff can perform given her age, work experience, education, and RFC. Tr. 24.

### III.   DISCUSSION

In Plaintiff's memorandum, she states that she is appealing the ALJ's determination at Step 5. ECF Doc. 11 at 16. Specifically, as stated above, Plaintiff contends the ALJ failed to consider whether the combination of her impairments prevent her from working full time because she would be off task 10-15% of the workday. *Id.* at 17. The problem with this argument, however, is that there is simply no evidence to support Plaintiff's position. Plaintiff does not identify any physician

who has identified any specific percentage of the workday that she would be unable to work. *See Joy J. v. Comm'r, Soc. Sec. Admin.*, 2022 WL 4397530, at *12 (N.D. Ga. Sept. 22, 2022) (finding that because there was no physician who imposed any specific percentage of the workday that plaintiff would be unable to work, the ALJ "could have easily left this restriction out entirely rather than giving claimant a generous limitation of an up to 10% off-task limitation") (internal citations omitted). To the contrary, as will be discussed below, one of Plaintiff's treating physicians stated Plaintiff could work with sufficient bathroom breaks. Moreover, Plaintiff does not point to anything in the objective records that would support such a determination.

Instead, Plaintiff appears to rely upon a hypothetical her counsel posed to the VE, which asked the VE to identify the impact of a hypothetical employee being "off task averaging 10-15% every single workday" "because of any variety of symptoms." Tr. 68. In response to counsel's inquiry, the VE stated, "[t]hat individual would not be able to work." *Id.* However, because there is no support in the record to show Plaintiff will be off-task 10-15% of the workday, the ALJ was not required to rely on the VE's response. *See Brown v. Comm'r. of Soc. Sec.*, 680 F. App'x 822, 828 (11th Cir. 2017) ("As for Brown's claim that her impairments would cause her to be absent and off task in excess of employer tolerances, there is

no support in the record for this claim. As a result, the ALJ was not required to rely on the VE's response to the fourth hypothetical.") (internal citations omitted).

As discussed below, Plaintiff's medical history simply does not support Plaintiff's position. On March 23, 2016, Plaintiff was treated at Northwest Florida Regional Medical Center emergency room for a "visual disturbance," which she described as "blurred vision with flashing lights." Tr. 410. Medical providers reported "no obvious etiology." *Id.* Although it was recommended Plaintiff be admitted to the hospital, Plaintiff decided to leave. Tr. 412.

Plaintiff returned to the emergency room the next day with complaints of visual changes and migraines. Tr. 372. She claimed that while she was standing in the bathroom, her vision went black. *Id.* Medical records note her speech was not slurred and she did not exhibit ataxia or confusion. Tr. 373. Although she reported having had similar episodes, she also stated she has not received any formal diagnosis. *Id.* A physical exam revealed Plaintiff was alert and oriented x3, with 5/5 strength in her extremities. Tr. 376. Also, her sensory function was intact, and her speech was fluent. A CT scan was performed which resulted in normal findings. Tr. 380.

The following month, Plaintiff was seen at the Cardiac & Vascular Institute for hypertension and possible total joint arthroplasty. Tr. 533. All her cardiovascular tests were normal, and Plaintiff reported that even when she gets

migraines, "things seem to be better." *Id.* Her physical examination was normal, and it was recommended she return on an as-needed basis. Tr. 534.

In June 2016, Plaintiff was seen by neurologist, Dr. Dharmaraj, at University of Florida Health. Tr. 862. Her physical and neurological examinations were normal. Her mental status was alert and oriented, her memory was intact, she had a good fund of knowledge of current events, and her language was clear and fluent. Tr. 866. Based on Plaintiff's report of her symptoms, which included descriptions of seizure-like episodes, Dr. Dharmaraj put Plaintiff on Keppra, a medication for epileptic seizures, and recommended her for an EEG. Tr. 868. In July 2016, Plaintiff underwent an extended EEG for seizure activity. Tr. 879. The results were normal. *Id.*

In August 2016, Plaintiff saw Dr. Burks at the University of Florida Memory Disorder Clinic. Plaintiff reported having headaches 2-3 times a week. Tr. 840. Dr. Burks noted the EEG results ruled out epileptic seizures and that her prior MRI and CT were also normal. Tr. 844. Her neurological exam was also normal; Plaintiff's judgment and insight were intact and her comprehension was within normal limits. *Id.* She was alert and oriented x 10. *Id.* Her neuropsychological screening showed "significant minimal mild cognitive impairment with very mild frontal executive deficits and a very mild registration deficit with intact spontaneous encoding and no evidence of encoding deficit." Tr. 848. Dr. Burks reported that her clinical picture

for memory and cognitive complaints to be "indeterminate" given the "deficits seen were minimal." Tr. 849. Dr. Burks ruled out "neurodegenerative disorders" as "plausibly on the list of possibilities" for Plaintiff's complaints. *Id.* He recommended Dr. Dharmaraj reconsider whether Plaintiff needs to continue anti-epileptic medication. Tr. 850. Dr. Burks did not restrict Plaintiff from driving her personal vehicle. *Id.*

In October 2016, Plaintiff was admitted into the Shands Epilepsy Monitoring Unit for evaluation and additional testing. Tr. 886. During this visit, Plaintiff reported her last episode occurred in September, during which she could not remember some plans and had difficulty using her cell phone. *Id.* She reported the frequency of her episodes had decreased since she stopped working because of a decrease in exposure to sunlight. *Id.* Her physical examination was normal, and her mental status examination was normal. Tr. 890. Plaintiff was discharged on November 4. According to the discharge summary, Plaintiff was taken off Keppra and monitored from the 31st to the 4th. Tr. 883. During this time, "subjective activating procedures" were activated as well, but "despite these measures" no typical spell or seizure activity was recorded. *Id.* Plaintiff asked to be discharged, and for her EEG to be monitored remotely. She stated her seizures are more likely to occur in high stress situations when she is moving around at home. *Id.* Another

MRI was done on an outpatient basis, a month later, which was also normal. Tr. 507.

Plaintiff continued to be seen by medical providers at UF Health Neurology. During her February visit, she reported having two episodes after she was taken off Keppra and discharged from the EMU. However, a review of the only recorded episode "did not appear to be a typical elliptic event." Tr. 821. She also underwent an ambulatory EEG, which was also normal. Tr. 825. According to Plaintiff, no seizure activity was reported on the ambulatory EEG because Plaintiff stayed in bed most of the time. Tr. 821. She was continued on migraine medication. Tr. 825.

In August, she saw Dr. Shuhaiber. Her examination was normal; she was alert and oriented, her language was normal and fluent and her memory was intact. Tr. 809. Her neurological examination was normal. Tr. 810. Her September examination was also normal. Tr. 798. Plaintiff continued to be treated with medications through 2020. In July 2020, Plaintiff underwent another EEG, which once again failed to identify any epileptic seizures. Tr. 962.

As the above history demonstrates, doctors were unable to find any etiology for Plaintiff's seizure-like episodes, questioned whether they were even seizures, and, regardless, treated Plaintiff conservatively with medication. The same is true with regard to Plaintiff's complaints regarding IBS.

On October 10, 2015, Plaintiff went to the emergency department at Northwest Florida Medical Center complaining of abdominal pain, which she reported had been a problem for at least the past year but was worsening. Tr. 400. An ultrasound of the abdomen, however, was normal, as was her physical examination. Tr. 403, 406. Doctors were unable to find an etiology for the pain. Tr. 408. Plaintiff was discharged on the following day and told to follow up with Dr. Renata Wajsman. Tr. 370. She was seen in the emergency room again on October 13, and a second ultrasound was also negative and her physical examination normal. Tr. 395, 397. In November 2015, Plaintiff had her gallbladder removed. Tr. 420. Nonetheless, she continued to complain to Dr. Wajsman of abdominal pain and IBS throughout 2016, 2017, 2018, 2019 and 2020. Dr. Wajsman conducted testing and determined Plaintiff had gastroparesis. Tr. 691. However, despite Plaintiff's complaints, her physical examinations were always normal and she was treated with medications. *See e.g.,* Tr. 645, 907-08.

Plaintiff was also treated conservatively for her cervical and lumbar disease. Plaintiff saw a rheumatologist as early as 2015, although at that time she was complaining primarily of muscle stiffness in the morning. Tr. 362. She had no joint swelling. *Id.* Plaintiff had an MRI of her lumbar and cervical spine in March 2017, which showed disc bulges at L3/4, L4/5 and L5/S1, as well as stenosis at L4/5 with neural impingement, and a herniated disk at L5/S1 with neural impingement on the

left. Tr. 504. She also had a disc bulge at C4/5 without herniation or neural impingement. *Id.* The following month, however, Plaintiff went to Disneyland. Tr. 575. Moreover, her physical examinations were generally normal. Tr. 737-38 (July 2017 examination noting normal muscle strength and gait); Tr. 583-84 (August 2017 examination with same findings); Tr. 722 (August 2019 examination with same findings).

The ALJ also considered several letters that were submitted by Plaintiff's treating physicians but found them to be inconsistent with, and unsupported by, the objective data. Under the new Social Security Administration ("SSA") regulations which apply to claims filed on or after March 27, 2017, the SSA "will consider the persuasiveness of all medical opinions and evaluate them primarily on the basis of supportability and consistency." *Mackey v.* Saul, 2020 WL 376995, at *4 n.3 (D. S.C. Jan. 6, 2020) (citing 20 C.F.R. § 404.1520c(a),(c)(1)-(2)). While there are several factors the ALJ is to consider, "[t]he most important factors … are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)."[1] 20 C.F.R. § 416.920c.

---

[1] The other factors are relationship with the claimant, frequency of examinations, purpose of treatment relationship, extent of treatment relationship, examining relationship, specialization, and other factors which tend to support or contradict the medical source opinion. *See* 20 C.F.R. § 416.920c(c)(3)-(5).

Case No. 1:21cv214-AW-HTC

For example, in August 2017, Dr. Shuhaiber, Plaintiff's treating neurologist, wrote that Plaintiff "suffers from neurocognitive impairment, which affects her attention and focus, on a daily basis," and which are accompanied by migraines. Tr. 275. Plaintiff's examinations, however, consistently showed she was alert and oriented, her judgment and memory were intact, and her speech fluent. Regardless, Dr. Shuhaiber did not address what Plaintiff can or cannot do despite that impairment, as necessary to qualify as a "medical opinion." *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Nowhere in Dr. Shuhaiber's letter does he identify how those conditions affect Plaintiff's ability to understand; remember; maintain concentration, persistence, or pace; carry out instructions; or respond appropriately to supervision, co-workers, or work pressures in a work setting. *See id.*

Similarly, the ALJ found a 2017 letter from Dr. Wajsman, Plaintiff's treating gastroenterologist, to be unsupported by the record. In the letter Dr. Wajsman diagnosed Plaintiff with gastroesophageal reflux disease, gastroparesis, and IBS. Tr. 276. Dr. Wajsman stated the impairments "have resulted in various impairments and disabilities and have impacted aspects of life interfering with daily functioning." *Id.* She noted, however, that Plaintiff's reported symptoms are intermittent and, thus, concluded Plaintiff should be able to carry on work activities provided accommodations in the workplace during flare ups allowed her to sit when needed, have bathroom privileges as needed and to take additional breaks as needed. The

record, however, showed the symptoms were intermittent, varied in severity, and were controlled by medications. Tr. 971.

The ALJ also considered a September 2017 letter from one of Plaintiff's treating neurologists, Dr. George Feussner, in which he stated Plaintiff suffers from "migraine headaches, cervical radiculopathy, and lumbar radiculopathy." Tr. 277. While Dr. Feussner noted Plaintiff has had "episodes," he concluded Plaintiff did not need to be accommodated for those episodes because they had not been identified as seizures. *Id.* He restricted her to light duty for her neck and back. Tr. 278. The ALJ found the letter to be vague, failed to identify any functional limitations, and was unsupported by the record, given the lack of evidence showing any focused treatment for Plaintiff's neck and back. Also, since 2017 Plaintiff has received minimal treatment for her neck and back, consisting mostly of medication refills. Moreover, Plaintiff's physical examinations in 2019, 2020, and 2021 were normal for range of motion, strength and tone, and gait and station. Tr. 722, 914, 939.

The ALJ considered a 2020 consultative mental examination of Plaintiff performed by psychologist Brittainy Shaw. Tr. 925. Shaw diagnosed Plaintiff with unspecified bipolar disorder and with moderate-to-marked limitations in tolerating stress and responding appropriately to others. *Id.* Shaw also found Plaintiff to be slightly limited in her ability to understand, remember, and carry out instructions and to be moderately limited in her ability to sustain attention and concentration

toward the performance of simple repetitive tasks. *Id.* The ALJ noted an absence of record evidence to support Shaw's findings of marked limitations and, instead, found her conclusions to be based largely upon Plaintiff's self-reported symptoms.[2] Tr. 23. Also, Shaw's conclusions were not consistent with her objective findings, which showed Plaintiff's immediate, recent, and recall memory, judgment, insight and decision making to be intact and her coping skills to be good. Tr. 924. Nonetheless, in considering Plaintiff's subjective complaints, the ALJ limited Plaintiff to low stress work not involving strict production requirements.

In contrast to those letters, the ALJ found the opinions of the state agency consultants to be persuasive because they were consistent with the record. Those opinions included a February 2020 opinion from Dr. Fister who concluded Plaintiff could perform light work, including sitting or standing/walking for up to 6 hours of an 8-hour workday. Tr .82-83. In June 2020, state agency physician Dr. Ignacio reached the same conclusion. Tr. 105-106. A state agency psychologist and psychiatrist also reviewed Plaintiff's medical records and found Plaintiff to have no more than moderate limitations. Tr. 75-88, 97-111. Specifically, they determined Plaintiff could understand and remember simple instructions, sustain attention and

---

[2] In the factual section of her memorandum, Plaintiff summarizes the function reports she and her husband completed regarding Plaintiff's symptoms. Plaintiff, however, does not argue the ALJ erred in his consideration of her subjective symptoms. Thus, any such argument is waived. *See e.g., Bookman v. Comm'r of Soc. Sec.*, 490 F. App'x 314, 317 n.2 (11th Cir. 2012) (citing *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012)).

Case No. 1:21cv214-AW-HTC

concentration on simple tasks for 2-hour segments, interact with others on occasion and adapt to a change in a routine setting. Tr. 86-87.

The ALJ's RFC is supported by substantial evidence and the Commissioner's decision should be affirmed.

Accordingly, it is respectfully RECOMMENDED:

1. That the decision of the Commissioner be AFFIRMED, and Hopp's application for Disability Insurance Benefits be DENIED.

2. That the clerk be directed to enter judgment in favor of the Commissioner and close the file.

At Pensacola, Florida, this 6th day of January, 2023.

*s/ Hope Thai Cannon*
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed **within fourteen (14) days** of the date of this Report and Recommendation. Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. A copy of objections shall be served upon the Magistrate Judge and all other parties. A party failing to object to a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.

Case No. 1:21cv214-AW-HTC